AGS INTERNATIONAL SERVICES S.A., Alfonso G. Andress, and Jose Florian, Individually and on Behalf of Certain Former Employees of AGS Plaintiffs

v.

NEWMONT USA LIMITED, Newmont Peru Limited, Minera Yanacocha S.R.L., Sodexho Alliance S.A., Sodexho Peru S.A.C., Defendants

No. 1:02 CV 02543(RBW).

United States District Court, District of Columbia.

Nov. 16, 2004.

Lawrence Harbin, McIntyre Harbin & King, LLP, Washington, DC, for Plaintiffs.

William D. Iverson, Covington & Burling, Sara D. Schotland, Cleary, Gottlieb,

Steen & Hamilton, Washington, DC, for Defendants.

## MEMORANDUM OPINION

WALTON, District Judge.

Currently before the Court is the Motion to Dismiss by Minera Yanacocha and the Newmont Defendants [D.E. #8] ("Newmont's Mot.") and the Motion by Sodexho Alliance and Sodexho Peru to Dismiss the Complaint [D.E. #9] ("Sodexho's Mot."). The plaintiffs have filed an opposition to the defendants' motions, Plaintiffs' Memorandum in Opposition to Newmont's and Sodexho's Motions to Dismiss ("Pls.' Opp."), Plaintiffs' Supplemental Memorandum Setting Forth Jurisdictional Facts in Opposition to Newmont's and Sodexho's Motion to Dismiss ("Pls.' Supp."), and the defendants have filed replies to the opposition, Reply Memorandum in Support of Motion to Dismiss by Minera Yanacocha and the Newmont Defendants ("Newmont's Reply"); Reply Brief of Sodexho Alliance and Sodexho Peru in Support of Motion to Dismiss ("Sodexho's Reply"). Upon careful consideration of the parties' pleadings and the entire record in this case, the Court concludes that both motions should be granted because this Court cannot exercise general or personal jurisdiction over any of the defendants.

## I.  The Parties and the Factual Background

### A.  The Parties

The plaintiffs, AGS International Services, S.A. ("AGS"), Alfonso G. Andress ("Andress") and Jose Florian ("Florian"), individually and on behalf of certain former employees of AGS, have brought this action against Newmont USA Limited ("Newmont USA"), Newmont Peru Limited ("Newmont Peru") and Minera Yanacocha S.R.L. ("Minera Yanacocha") (collectively "Newmont defendants") as well as Sodexho Alliance, S.A. ("Sodexho Alliance") and Sodexho Peru S.A.C. ("Sodexho Peru") (collectively "Sodexho defendants").

AGS was established in 1990 in Lima, Peru, where it provides vending and food processing services as well as "industrial catering and hospitality services" to companies which operate remote mining and oil refining sites. Am. Compl. ¶ 14.[1] In order to serve American food products to American consumers in Peru, AGS imports food items from the United States to Peru. *Id.* Andress, a European citizen living in Peru, is the Chairman of AGS. *Id.* ¶ 15. Florian, a Peruvian citizen and a former AGS employee who worked at the Yanacocha mines in Peru, is a member of a proposed class of former AGS employees. *Id.* ¶ 16.

Newmont USA is a publicly traded corporation, incorporated in Delaware and with its principal place of business in Denver, Colorado. *Id.* ¶ 6. Newmont USA also maintains a two room office at 1800 Massachusetts Avenue, N.W. in the District of Columbia, which is leased from the law firm of Shea & Gardner and staffed by Mary Beth Donnelly. *Id.;* Memorandum in Support of Motion to Dismiss by Minera Yanacocha and the Newmont Defendants ("Newmont's Mem.") at 8. Ms. Donnelly is Newmont USA's Group Executive for Government Relations and her employment duties are to "serve as a liaison between Newmont USA and the legislative and executive branches of the United States government [,] to regularly lobby members of

---

1. References to the Am. Compl. are to the Amended Complaint filed by the plaintiffs on January 31, 2003.

the federal government on Newmont's behalf ... [, and to] act as a liaison between Newmont USA and the embassies of the various countries in which Newmont USA does business." *Id.*, Exhibit ("Ex.") C (Declaration of Mary Beth Donnelly taken on February 25, 2003) ("Donnelly Decl.") ¶ 10.[2] Ms. Donnelly has also served as Treasurer of The American–Uzbekistan Chamber of Commerce ("AUCC"), which is located in the District of Columbia, as of June 2002, and as Vice Chairperson of the North American–Kyrgz Business Council ("NAKBC"), which is located in Falls Church, Virginia. Pls.' Opp., Ex. 8 (list of AUCC Board of Directors as of June 2002); Ex. 9 (Information pertaining to AUCC); Ex. 12 (Information pertaining to the NAKBC).[3]

Newmont Peru is a Delaware corporation with its principal place of business in Lima, Peru. It is registered to do business in Peru and operates as the manager of Minera Yanacocha. Newmont's Mem., Ex. B (Declaration of Carlos Santa Cruz taken on February 24, 2003) ("Cruz Decl.") ¶ 3. Minera Yanacocha is a limited liability partnership organized under the laws of Peru with its principal place of business in Lima, Peru. Newmont's Mem., Ex. A (Declaration of Federico Schwalb Helguero dated February 24, 2003) ("Helguero Decl.") ¶ 3. Minera Yanacocha is a joint venture, which is 51.35% owned by Newmont USA, 43.65% owned by Compania de Minas Buenaventura, S.A., a mining company in Peru, and 5% owned by the International Finance Corporation ("IFC").[4] Am. Compl. ¶ 7. According to the Securities and Exchange Commission ("SEC"), "Newmont Peru is responsible for managing, conducting and controlling the day to day operations of Minera Yanacocha ...." Pls.' Opp., Ex. 14 at 51 (Buenaventura Mining Company's submission to the SEC for the fiscal year ending December 31, 2000).[5] Minera Yanacocha began its mining operations in 1993 and is a leading gold

**2.** Ms. Donnelly also declares that "[she has] no other responsibilities or activities in the District of Columbia on behalf of Newmont USA. [She also represents that she does] not engage in any sales or marketing activities in the District of Columbia." Newmont's Mem., Ex. C (Donnelly Decl.) ¶ 11.

**3.** The American–Uzbekistan Chamber of Commerce ("AUCC") is located at 1800 Massachusetts Avenue, N.W., Washington D.C., Pls.' Opp., Ex. 8 (list of AUCC Board of Directors as of June 2002), where as already indicated, Newmont USA also maintains a two room office, Am. Compl. ¶ 6. Lawrence Kurlander, CEO of Newmont USA, served as President of the AUCC while Ms. Donnelly was the Treasurer of the AUCC. Pls.' Opp., Ex. 10 (list AUCC's Board of Directors). The North American–Kyrgz Business Council ("NAKBC") is a non-profit organization whose goal "is to promote trade between North American and the Kyrgyz Republic and to provide information on current and potential investment opportunities in Kyrgzstan. To provide a forum to promote the goals of the NAKBC, for NAKBC members, events

were arranged to include briefings, panel discussion, luncheons and dinners with senior Kyrgz delegations to Washington, D.C." Pls.' Opp., Ex. 12 (Information pertaining to the NAKBC).

**4.** The IFC is

a member of the World Bank Group [and] is an international lending institution created pursuant to "Articles of Agreement" among a number of nations, including the United States. The IFC's capital is provided by member countries. The United States is a major shareholder in the IFC, and the Secretary of the Treasury serves on the IFC's Board of Governors.

Newmont's Reply at 3 (internal citations omitted).

**5.** "Though a Newmont affiliate manages [Minera Yanacocha], [Minera Yanacocha's] employees consist almost entirely of Peruvian nationals, including [Minera Yanacocha's] general manager." Pls.' Opp., Ex. 4 at 1 (IFC Summary of Minera Yanacocha Project Information dated May 3, 1999).

producer globally, with its mine located "47 km north of the city of Cajamarca at an altitude of 4,000 meters above sea level." Pls.' Opp., Ex. 4 (IFC Summary of Minera Yanacocha Project Information dated May 3, 1999). Minera Yanacocha received IFC funding in 1993, 1994, and 1999. Pls.' Opp., Ex. 5 (IFC Project Brief of Minera Yanacocha). In 1999 the IFC approved a $100 million loan to Minera Yanacocha. *Id.*

Sodexho Alliance is a "societe anonyme, a French limited liability company, organized under the laws of France with its principal place of business in France." Memorandum in Support of Motion to Dismiss by Sodexho Alliance and Sodexho Peru ("Sodexho's Mem.") at 4. Sodexho Alliance owns stock in more than 200 subsidiaries in 74 countries, with operations in four primary business areas: Food and Management Services, Remote Sites, Service Vouchers and Cards, and River and Harbor Cruises. Pls.' Supp., Ex. 1 (Affidavit of Sian Herbert–Jones dated February 21, 2003) ("Herbert–Jones Aff.") ¶ 2. One of its subsidiaries is Sodexho Peru, a "sociedad anonima cerrada organized under the laws of Peru with its principal place of business in Lima, Peru", which was created to generate business in Peru. Sodexho's Mem. at 4.[6] Another subsidiary of Sodexho Alliance is Sodexho, Inc., which is incorporated in Delaware and provides food services at the Federal Bureau of Investigations headquarters in the District of Columbia at 935 Pennsylvania Avenue, N.W. Am. Compl. ¶ 17.

Sodexho Marriott Services, Inc. ("SMS") is also a subsidiary of Sodexho Alliance which was formed on March 27, 1998. Pls.' Supp., Ex. 2 (Assistance Agreement between Sodexho Alliance and Marriott International, Inc. dated March 27, 1998). SMS is in the food service and facilities management business. *Id.* SMS's headquarters is located at 2900 Van Ness Street, N.W., in the District of Columbia. Pls.' Supp. at 2 n. 2. Pursuant to a Royalty Agreement between Sodexho Alliance and Marriott International, Sodexho Alliance authorized SMS to use its trade name in promotional material, advertisements and its logo. Pls.' Supp., Ex. 3 at 2, 4 (Royalty Agreement between Sodexho Alliance and Marriott International, Inc. dated March 27, 1998).

Universal Sodexho, another subsidiary of Sodexho Alliance, was acquired in 1997 and is located in Harahan, Louisiana. Pls.' Opp., Ex. 1E (computer website printout pertaining to Universal Sodexho) and 1G (Dun & Bradstreet report concerning Universal Sodexho dated July 10, 2000). AGS conducted business directly with Universal Sodexho through April of 2000. Pls.' Opp., Ex. 1A (facsimile from Christophe Parent,[7] former Vice President of Remote Site Management for Sodexho Alliance, to defendant Andress dated April 26, 1999); Ex. 1B (facsimile from Christophe Parent to defendant Andress dated April 1, 2000); Ex. 1C (letter from defendant Andress to Barry Blackwell, President of Universal Sodexho, dated April 24, 2000); Ex. 1D (letter from defendant Andress to Barry

---

**6.** "In Peru, AGS is Sodexho's primary competitor." Am. Compl. ¶ 17.

**7.** Mr. Parent was most recently President of Remote Site Management for Sodexho Alliance. Pls.' Supp., Ex. 13 (affidavit of Christophe Parent dated July 8, 2003) ("Parent Aff.") ¶ 1. His previous positions at Universal

Sodexho included Vice President South American and Vice President of Strategy, Plan and Offer Development. *Id.* Mr. Blackwell is purportedly the President of Universal Sodexho. Pls.' Opp., Ex. 1 (declaration of defendant Alfonso G. Andress dated on April 15, 2003) ("Andress Decl.") ¶ 8.

Blackwell dated May 29, 2000); and Ex. 1E.

According to Hoovers Online Business Network, another Sodexho Alliance subsidiary, Sodexho Pass, "operated river and harbor dinner cruises on a fleet of more than 40 boats in cities such as . . . Washington D.C." Pls.' Opp., Ex. 1H at 1 (Hoovers Online's company profile of Sodexho Alliance dated July 11, 2000).[8] Sodexho Alliance also entered into an International Joint Venture Agreement with the Corrections Corporation of America ("CCA") in 1994 to enhance the "prison management business in a geographic territory that specifically excluded the United States." Sodexho's Reply, Ex. C (Supplemental Affidavit of Sian Herbert–Jones dated September 17, 2003) ("Herbert–Jones Supp. Aff.") ¶ 3.[9]

## B.  Factual Background

The following are the facts alleged in the plaintiffs' amended complaint that gave rise to the filing of this cause of action: On January 24, 2000, Sodexho Peru and AGS entered into a three year confidentiality agreement pursuant to a November 3, 1999 joint venture agreement negotiated by Barry Blackwell, wherein AGS agreed to lease its Lima factory to Sodexho Peru to supply catering service to 3500 workers at the Antamina Mines ("Antamina") in Peru, which was operated by the Bechtel Corporation ("Bechtel"). Am. Compl. ¶¶ 69–70.[10] AGS granted more than 30 Sodexho Peru employees access to its facilities in Peru in order for Sodexho Peru to fulfill the terms of the parties' agreement. Id. ¶ 101. On January 12, 2000, Sodexho Peru issued numerous purchase orders to AGS for the acquisition of food products that would be served at Antamina. Id. ¶ 102. Shortly thereafter, in February 2000, Sodexho Peru issued additional purchase orders for AGS to supply food products totaling over $300,000. Id. ¶ 103. AGS ordered materials from numerous suppliers to satisfy the requirements of the purchase orders. Id.

On February 19–20, 2000, 250 Antamina mine workers reported that they had contracted food poisoning. Id. ¶ 71. Sodexho Peru accused AGS for causing the illnesses and allegedly told AGS' customers and suppliers that AGS had "poisoned or caused" the Antamina mine workers "to be poisoned." Id. ¶ 115. On March 3, 2000, Bechtel conducted an independent investigation and concluded that the cause of the food poisoning was Sodexho Peru's improper handling and storage of food items after AGS had delivered the items to Sodexho Peru. Id. ¶ 71. Sodexho Peru allegedly "attempted to suppress" Bechtel's report and continued to blame AGS for the illnesses. Id. As a result of these accusations, AGS terminated Sodexho Peru's access to the Lima factory. Id. AGS contends that Sodexho Peru removed from the Lima facility "documents containing proprietary and confidential" information in violation of the three-year agreement of confidentiality the parties previously executed in January 2000. Id. The following year, on January 19, 2001, the Newmont

8.  Sodexho Alliance's Chief Financial Officer, Sian Herbert Jones, avers that "[a]ll river and harbor cruise business in the U.S. is operated by . . . Spirit Cruises, Inc. Sodexho Alliance is not involved in the day to day management of Sprit Cruises in the United States." Sodexho's Reply, Ex. C (Supplemental Affidavit of Sian Herbert–Jones dated September 17, 2003) ("Herbert–Jones Supp. Aff.") ¶ 2.

9.  Sodexho Alliance's agreement with the CCA terminated in 2001. Herbert–Jones Supp. Aff. ¶ 3.

10.  Antamina Mines is "a large copper, zinc, and iron ore mine also located in Peru, northeast of Lima, and operated by [the] Bechtel Corporation ("Bechtel")." Am. Compl. ¶ 69.

defendants announced that they had awarded to AGS the catering and hospitality contract for Yanacocha.[11] *Id.* ¶ 33–34. "In preparation to deliver under the ... contract, AGS provided a $1.2 million performance bond in the nature of a standby letter of credit." *Id.* ¶ 34. AGS also paid $700,000 to acquire "new culinary and kitchen equipment" imported from Europe, hired approximately 160 workers to service the Yanacocha site and conducted an on-site inventory of available raw materials. *Id.* ¶ 34.

On March 23, 2001, AGS and Minera Yanacocha executed a three year contract, which would expire on May 14, 2004, whereby AGS would "provide food service, cleaning, laundry and maintenance services for workers and administrative staff of [Minera Yanacocha], Newmont USA, and Newmont Peru ..." at the Yanacocha mines. *Id.* ¶ 35. AGS contends that Minera Yanacocha "agreed to seal, or accept and acknowledge, monthly invoices issued by AGS up to three months in advance" of when its services would be provided.[12] *Id.* ¶ 36. This enabled AGS to obtain cash advances so it could purchase the food items it needed to serve at the Yanacocha mines. *Id.* And this alleged undocumented arrangement permitted AGS to fulfill its obligations under the contract for fifteen months until June 2002. *Id.* ¶ 37. The first year of the contract was uneventful. *Id.* ¶ 37. In anticipation of expanding its operations at the mine as a result of the Newmont defendants' indication that they wanted AGS to service all of its 3,000 workers at the Yanacocha mines, rather than just the 1,100 workers initially covered by the contract, *id.* ¶ 38, AGS hired and trained additional employees. *Id.* ¶ 39 AGS also advised the Newmont defendants of its plans to build a new automated food production facility at or near the mines. *Id.* In addition, AGS began to establish facilities in Pennsylvania in anticipation of the expansion. *Id.* ¶ 40.

However, in April 2002, the Newmont defendants started to complain about the quality of food service being provided by AGS. *Id.* ¶ 41. Consequently, AGS had the Yanacocha facilities inspected by an international inspection and certification agency. *Id.* ¶ 42. The Yanacocha facilities received an "A" rating from the inspection agency, scoring "92/100 for all categories inspected." *Id.* AGS alleges that during the same time period when the Newmont defendants began complaining about the quality of the food, they also allegedly told AGS' customers and suppliers that AGS was insolvent, financially distressed, or otherwise unable to adequately deliver catering services to its customers, including the workers at the Yanacocha mines. *Id.* ¶ 116. In June 2002, the Newmont defendants also refused to continue sealing advanced monthly invoices for the food, cleaning, and maintenance services, despite the alleged unwritten understanding that they would do so and the fifteen month course of conduct between the parties regarding the execution of the advances. *Id.* ¶ 43. AGS contends that the Newmont defendants took its new position to prevent AGS from being able to fulfill

---

11. The Amended complaint does not specify which Newmont defendant made the announcement, however, Exhibit A of the original Complaint sets forth the agreement between AGS and Minera Yanacocha.

12. This alleged agreement regarding the monthly invoices was not incorporated into the written contract. Am. Compl. ¶ 36. In addition, AGS alleges that Michael Mitchell, Controller of Newmont USA, explicitly stated to AGS that Newmont wanted and had planned for AGS to deliver services to the Yanacocha mines for the entire 20 year period Newmont had mining rights at the mines. *Id.* ¶ 89. However, this purported agreement was also not included in the written contract.

its contractual obligations. *Id.* AGS took exception to the changed procedure and requested that the matter be submitted to arbitration as provided for in the contract. *Id.* ¶ 44.

In July 2002, the Newmont defendants communicated their concerns to AGS regarding AGS' financial ability to continue performing under the contract. *Id.* ¶ 45. In addition, they delayed or refused to pay outstanding invoices for past services already rendered, yet continued to accept AGS' services and goods while AGS continued to seek arbitration. *Id.* In August 2002, AGS offered to continue supplying the food and other services to the Yanacocha mines in partnership with the Compass Group, a financially sound industrial catering and hospitality company, but the Newmont defendants rejected this proposal. *Id.* ¶ 46. On August 23, 2002, the Newmont defendants terminated the contract and "effected execution upon a $510,000 standby letter of credit that AGS previously provided to secure its performance under the contract." *Id.* ¶ 47.[13] The execution of the standby letter of credit also "invoked execution against [another] $1.2 million letter of credit." *Id.* Then, on August 26, 2002, the Newmont defendants gave AGS only 24 hours to retrieve its food supplies and equipment from the Yanacocha mines, even though it had taken three months to install the equipment. *Id.* ¶¶ 94, 95.[14] The plaintiffs also allege that on August 26, 2002, the Newmont defendants kidnaped 160 AGS employees and coerced 155 of them to accept jobs with them at lower pay so the workers at the Yanacocha mines could continue to be serviced. *Id.* ¶ 58. Specifically, AGS contends that its employees were assembled at the Yanacocha mining camp and were falsely told by the Newmont defendants that AGS was bankrupt and had wrongfully terminated the March 23, 2001 contract and that Sodexho Peru would hire the AGS employees to perform their same jobs at the same pay and with identical benefits. *Id.* That same day, 160 AGS employees were allegedly placed on an AGS bus and detained until after midnight at a remotely located gas station situated on a road several miles between the Yanacocha mining camp and the city of Cajamarca. *Id.* The employees were purportedly held until they acknowledged their resignations as AGS employees in written letters prepared for them by the Newmont defendants. *Id.* The plaintiffs further allege that the employees were interrogated for the purpose of obtaining information concerning their salaries and AGS' operating procedures, as well as confidential internal business affairs information of AGS. *Id.* ¶ 76. Other AGS employees were allegedly forced, intimidated, or coerced into signing false statements relative to legal proceedings concerning the defendants' actions. *Id.* ¶ 59.[15] After August 26, 2002,

---

**13.** The Court notes that the arbitration decision concluded that the contract was terminated on August 26, 2002. Sodexho's Reply, Ex. B at 38 (Arbitration Decision of August 21, 2003).

**14.** Ultimately the dispute between AGS and Minera Yanacocha was submitted to arbitration and a decision was issued by the arbitrator on August 21, 2003. *Id.* ¶ 49. The arbitrator concluded that defendant Minera Yanacocha (1) was under no contractual obligation to "seal" AGS' invoices; (2) validly terminated the contract because AGS was financially incapable of performing under the contract due to its own mismanagement; (3) did not engage in any misconduct related to the August 26, 2002 resignation of AGS's employees; and (4) did not engage in any misconduct to replace AGS with Sodexho Peru. Sodexho's Reply, Ex. B at 21, 22, 24,-30, (Arbitration Decision dated August 2, 2003).

**15.** AGS contends that this conduct continued until the date of the filing of its amended complaint. *Id.* ¶ 59.

the Newmont defendants hired Sodexho Peru to replace AGS. The Newmont defendants and Sodexho then allegedly refused to allow AGS to recover its food supplies warehoused at the Yanacocha mines, destroyed some of AGS' equipment and "allowed said equipment to lie in waste" without providing AGS with a reasonable opportunity to retrieve or protect its equipment and supplies. *Id.* ¶ 95.

In December of 2002, the plaintiffs filed a complaint against all five defendants in this Court. The complaint asserted the following eight claims: (1) the defendants conspired to violate the Racketeering Influence Corrupt Practice Act ("RICO"), 18 U.S.C. § 1961 *et seq.* (2000), for the purpose of damaging the business of AGS, to kidnap and harm AGS employees, to influence the testimony of former AGS employees and to replace AGS with Sodexho Peru as the provider of the catering and other services at the Yanacocha mines; (2) false imprisonment of former AGS employees on August 26, 2002; (3) misappropriation of trade secrets by Sodexho Peru after AGS' 2001 contract was terminated in 2002; (4) intentional interference by the Sodexho defendants with contractual relationships of AGS and the Newmont defendants; (5) tortious interference by the Sodexho defendants with the prospective economic benefits AGS was to derive from the 2001 service contract; (6) conversion by the defendants of AGS' supplies and equipment that were located at the Yanacocha mines; (7) breach of contract by the Sodexho defendants; and (8) civil conspiracy by all of the defendants to replace AGS as the service provider at the Yanacocha mines. On January 21, 2003, the plaintiffs filed their Amended Complaint with this Court against all five defendants wherein a ninth claim for unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), was added. On February 27, 2003, the Newmont and So-dexho defendants filed separate motions to dismiss the amended complaint.

Newmont moves to dismiss (1) pursuant to Federal Rule of Civil Procedure 12(b)(2) on the grounds that this Court lacks personal jurisdiction over Newmont USA, Newmont Peru and Minera Yanacocha; (2) pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that the RICO and the Lanham Acts do not vest subject matter jurisdiction in this Court because neither can be applied extraterritorially in this case; (3) pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the plaintiffs' RICO and Lanham Act claims fail to state claims upon which relief can be granted; and (4) the non-federal claims if the RICO and Lanham Act claims are dismissed because without these federal claims the non-federal claims either must or should be dismissed.

The Sodexho defendants move to dismiss (1) pursuant to Federal Rule of Civil Procedure 12(b)(2) on the grounds that this Court lacks personal jurisdiction over Sodexho Alliance and Sodexho Peru; (2) pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that this Court is without subject matter jurisdiction pursuant to both the RICO statute and the Lanham Acts; (3) pursuant to Federal Rule of Civil Procedure 12(b)(6) on the grounds that the plaintiffs fail to state claims upon which relief can be granted under both the RICO statute and the Lanham Acts; (4) pursuant to the doctrine of forum non conveniens; and (5) the claims of Jose Florian and the former AGS employees because they lack standing to bring a RICO claim. After filing their opposition to the defendants' motions to dismiss, the parties agreed to participate in jurisdictional discovery. Thereafter, the Newmont and Sodexho defendants submit-

ted reply memoranda in support of their dismissal motions.

## II. Analysis

### A. Are the Defendants Subject to General or Personal Jurisdiction in the District of Columbia?

The plaintiffs posit several theories upon which they allege that this Court may exercise jurisdiction over Newmont USA, its subsidiaries Newmont Peru and Minera Yanacocha, as well as Sodexho Alliance and its subsidiary Sodexho Peru. First, they argue that "general jurisdiction" may be exercised over the Newmont defendants and Sodexho Alliance pursuant to the District of Columbia's long arm statute, D.C.Code § 13–334(a) (2001). Pls.' Opp. at 4–10. Second, the plaintiffs contend that "specific jurisdiction" may be exercised over all of the defendants in the District of Columbia pursuant to D.C.Code § 13–423(a)(1) (2001). *Id.* at 10–12. Third, the plaintiffs contend that all of the defendants are subject to personal jurisdiction in the District of Columbia pursuant to the RICO Act's nationwide service of process provision, 18 U.S.C. § 1965.[16] *Id.* at 12–15. Fourth, according to the plaintiffs, the Sodexho defendants are purportedly subject to personal jurisdiction in the District of

Columbia because of their conspiratorial activity with the Newmont defendants to violate the RICO and the Lanham Acts. *Id.* at 15–16. Finally, the plaintiffs opine that Sodexho Peru, Newmont Peru, and Minera Yanacocha are subject to personal jurisdiction in the District of Columbia as alleged alter egos of their parent companies, Sodexho Alliance and Newmont USA, respectively. Am. Compl. ¶¶ 6, 8, 17.

When personal jurisdiction is challenged pursuant to Federal Rule of Civil Procedure 12(b)(2), the "[p]laintiffs have the burden of proof to establish that the Court has personal jurisdiction .... All factual disputes concerning jurisdiction must be resolved in favor of the plaintiffs, ... and plaintiffs need only make a *prima facie* showing of personal jurisdiction in order to defeat [a] defendant['s] motion." *Jacobsen v. Oliver,* 201 F.Supp.2d 93, 104 (D.D.C. 2002). The plaintiffs' assertions of fact are "presumed to be true unless directly contradicted by affidavit," *DSMC, Inc. v. Convera Corp.,* 273 F.Supp.2d 14, 20 (D.D.C.2002) (citation omitted), or other evidence. When reviewing a challenge pursuant to Rule 12(b)(1) or 12(b)(2), the court may consider documents outside the pleadings to assure itself that it has juris-

---

**16.** 18 U.S.C. § 1965 (2000) states:

(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under section 1964 f this chapter in any district of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before this court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof.

(c) In any civil or criminal action or proceeding instituted by the United States un-

der this chapter in the district court of the United States for any judicial district, subpoenas issued by such court to compel the attendance of witnesses may be served in any other judicial district, except that in any civil action or proceeding no such subpoena shall be issued for service upon any individual who resides in another district at a place more than one hundred miles from the place at which such court is held without approval given by a judge of such court upon a showing of good cause.

(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.

diction. *See Land v. Dollar,* 330 U.S. 731, 735 n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947) ("when a question of the District Court's jurisdiction is raised, either by a party or by the court on its own motion ... the court may inquire by affidavits or otherwise, into the facts as they exist.") (citations omitted); *Haase v. Sessions,* 835 F.2d 902, 906 (D.C.Cir.1987) ("In 12(b)(1) proceedings, it has been long accepted that the judiciary may make 'appropriate inquiry' beyond the pleadings to 'satisfy itself on authority to entertain the case.'") (citations omitted); *Artis v. Greenspan,* 223 F.Supp.2d 149, 154 (D.D.C.2002).

### 1. General Jurisdiction Under D.C.Code § 13–334(a) (2001)

■ The general jurisdiction provision for the District of Columbia is found at § 13–334(a) of the District of Columbia Code,[17] and authorizes the courts in this jurisdiction to "exercise 'general jurisdiction' over a foreign corporation as to claims not arising from the corporation's conduct in the District, if the corporation is 'doing business' in the District." *Gorman v. Ameritrade Holding Corp.,* 293 F.3d 506, 509 (D.C.Cir.2002). The "doing business" test of this statutory provision was found by the District of Columbia Circuit to be coextensive with the due process requirements of the Constitution and "requires an examination of the frequency and volume of the [defendants'] transactions with District [of Columbia] residents." *Id.* at 513. Therefore, this Court may exercise general jurisdiction over a foreign corporation whose contacts with the District are so continuous and systematic that it could foresee being haled into a court in the District of Columbia. *Id.* at 509. For example, the defendant in *Gorman* was found to have continuous and systematic contacts with the District because "District residents use[d] its website to engage in electronic transactions with the [defendant]." *Id.* at 512. And "[a]s a result of their electronic interactions, [defendant] Ameritrade and its District of Columbia customers enter[ed] into binding contracts, the customers [became] the owners of valuable securities, and Ameritrade obtain[ed] valuable revenue." *Id.* at 512–513.

However, *some* presence in the District of Columbia is not alone grounds to exercise general jurisdiction in every situation. For example, in *Fandel v. Arabian Am. Oil Co.,* 345 F.2d 87 (D.C.Cir.1965), the defendant was in the business "of producing, refining, and selling oil and gas" in two countries in the Middle East. The Circuit Court in *Fandel* held that the defendant's District of Columbia six-room office where five employees worked did not alone constitute "doing business" in the District. *Id.* at 88–89. The defendant's activities in the District of Columbia in *Fandel* were to "maintain continuing relationships with the State Department and other executive agencies of the United States Government ... and with educational and international organizations, private and public ...," to keep them apprized of what was occurring in the Middle East and the defendant's activities in that region. *Id.* at 88. The Court reasoned that this was not the type of District of Columbia presence contemplated in § 13–

17. § 13–334(a) states:
In an action against a foreign corporation doing business in the District [of Columbia], process may be served on the agent of the corporation or person conducting its business, or, when he is absent and can not be found, by leaving a copy at the principal place of business in the District, or, where there is no such place of business, by leaving a copy at the place of business or residence or the agent in the District, and that service is effectual to bring the corporation before the court.

334(a)'s "doing business" clause. *Id.* Rather, the Court recognized that "Washington presents many business organizations with special needs for a continuous and ponderable physical presence [here] . . . [and] the purpose of Congress was not to make that presence in every case a base for the assertion of personal jurisdiction." *Id.* at 89.

#### a. Newmont USA

The plaintiffs argue that Newmont USA is subject to general jurisdiction in the District of Columbia because it is physically present in the District at an office located at 1800 Massachusetts Avenue, NW, staffed by one employee, Mary Beth Donnelly. Am. Compl. ¶ 6; Pls.' Opp. at 5–6. In addition, the plaintiffs argue that general jurisdiction exists in this Court because Newmont USA is also "doing business" in the District as a result of its relationship with and receipt of funding from the International Finance Corporation ("IFC"), a component of the World Bank, which is located in the District; its dealings with foreign embassies in the District; and the leadership positions several of the employees have held in several trade associations located in the District. Pls.' Opp. at 6–8. The plaintiffs also maintain that despite Ms. Donnelly's statements that Newmont USA does not do business in the District, she does not "unequivocally aver the absence of Newmont's activities in the District, presently or in the past," which demonstrate Newmont USA's District of Columbia contacts. *Id.* at 5.

Defendant Newmont USA, on the other hand, argues that general jurisdiction does not exist in the District of Columbia because "the mere presence of a single representative of a corporation who is limited to one type of activity does not ordinarily confer jurisdiction over the corporation as to matters unrelated to those activities." Newmont's Mem. at 8 (citing *Palmer v. Kawaguchi Iron Works, Ltd.*, 644 F.Supp. 327, 331 (N.D.Ill.1986) (mere presence of single employee who performed single type of activity insufficient to confer jurisdiction)). Newmont USA contends that its two room office rented from the law firm of Shea & Garner and staffed only by Ms. Donnelly, coupled with the activities she performs, does not amount to "continuous and systematic" contact with the District. *Id.* Newmont USA also posits that Ms. Donnelly's duties are to act as a liaison between Newmont USA and the federal government, and on occasion foreign embassies, not to sale or market Newmont USA products.[18] *Id.*

On this record, the Court concludes that Newmont USA is not subject to general jurisdiction in the District of Columbia for the following reasons. Its office operations here do not amount to the kind of presence intended to fall within the scope of D.C.Code § 13–334(a). Newmont USA's District of Columbia office operations are analogous to the defendants's activities in *Fandel*, where a six room office maintained for virtually the same reasons as Newmont USA—to interact with entities of the United States, along with public and private educational and international organizations—did not constitute "doing business" for jurisdictional purposes. *Fandel*, 345 F.2d at 88–89. As noted above, Newmont USA's presence in the District is solely for the purpose of maintaining relationships with the United

---

18. In addition, Newmont USA maintains that it "(1) does not transact business in the District; (2) is not licensed to do business in the District; (3) does not advertise or solicit business in the District; (4) does not own any real property in the District; and (5) does not have an agent for service of process in the District." Donnelly Decl. ¶¶ 4–8.

States government and foreign embassies, not for the sale or marketing of Newmont USA's services. Newmont's Mem., Ex. C (Donnelly Decl.) ¶¶ 10–11; *see Fandel*, 345 F.2d at 88–89. Furthermore, it would not comport with due process for this Court to exercise general jurisdiction over Newmont USA because of its contacts with foreign embassies, as the District of Columbia is the only district in the country where these embassies are located. *Id.* (defendant's District of Columbia "diplomatic and intelligence apparatus" which did not entail the pursuit of "contracts, either with our own Government or with other governments represented in Washington .... is a presence of a kind we think this court has heretofore regarded as falling outside the range of Congressional contemplation of the scope of 'doing business' as that phrase is used in 13 D.C.Code § 334.") (citations omitted). Newmont USA's ability to maintain diplomatic relations with other countries is facilitated by its presence in the District, which is not the type of contact worthy of consideration for jurisdictional purposes under § 13–334(a). Moreover, the plaintiffs' allegation concerning Newmont USA's relationship and receipt of funding from the IFC is not a correct characterization of Newmont's relationship with the IFC. Although the plaintiffs allege that Newmont USA engaged in dealings with the IFC, the record reflects that it was Minera Yanacocha that received funds from the IFC, not Newmont USA. *See* Pls.' Opp., Ex. 5 (Minera Yanacocha (Peru) Project Brief explaining the IFC's role and the project's development). As explained in more detail below, Newmont USA and Minera Yanacocha are separate entities, and thus Minera Yanacocha's receipt of funds from the IFC does not translate into receipt of funds by Newmont USA.

### b. Minera Yanacocha

■ The plaintiffs further allege that Minera Yanacocha is subject to the exercise of general jurisdiction in the District of Columbia because it receives funding from the IFC, its employees maintain contacts with IFC employees, and Minera Yanacocha employees traveled to the District of Columbia on 14 occasions from January 2000 through December 2002. Pls.' Supp. at 5.[19] Minera Yanacocha disputes the plaintiffs' assertion that it is subject to general jurisdiction in the District of Columbia because of the meetings that occurred here with IFC personnel. Newmont's Reply at 3. Minera Yanacocha argues that these meetings do not amount to the continuous and systematic contacts necessary for general jurisdiction under D.C.Code § 13–334(a).[20] *Id.* As noted by the Newmont defendants, the "[p]laintiffs have provided no [legal] authority for the proposition that merely communicating and meeting with a District resident is sufficient to subject a party to general jurisdiction." *Id.*

19. "Ten of those trips were made for purposes of visiting the District of Columbia based International Finance Corporation ("IFC") in connection with funding Yanacocha mines." Pls.' Supp. at 5.

20. Minera Yanacocha also maintains that (1) it does not transact business in the District of Columbia; (2) is not licensed to do business in the District; (3) does not advertize or solicit business in the District; (4) does not maintain an office in the District; (5) does not have any employees in the District; (6) does not own or lease any property in the District; (7) does not file any tax returns in the District; (8) does not have a telephone number in the District; (9) does not have a bank account in the District; and (10) does not have an agent for service of process in the District. Helguero Decl. ¶¶ 4–10; Santa Cruz Decl. ¶¶ 4–10.

This Court agrees that Minera Yanacocha's contacts with the IFC in the District are not "continuous and systematic" as required by due process. *Gorman,* 293 F.3d at 510. Unlike the defendant in *Gorman,* who the Circuit Court concluded had continuous and systematic contacts with the District because "District residents use[d] its website to engage in electronic transactions with the [defendant]," *id.* at 512, the meetings with the IFC personnel are not of such significant "frequency and volume" that Minera Yanacocha could reasonably anticipate being haled into court in the District for actions which occurred in Peru pursuant to a contract governed by Peruvian law. *Id.* at 513. As a joint venture that is partially owned by the IFC, Minera Yanacocha had little choice but to communicate with IFC personnel to maintain its financial viability. *See, e.g., Fandel,* 345 F.2d at 89 ("Washington presents many business organizations with special needs for a continuous and ponderable physical presence there, ... and that the purpose of Congress was not to make that presence in every case a base for the assertion of personal jurisdiction."); *see also In re Ski Train Fire in Kaprun, Austria on November 11, 2000,* No. 1428 (SAS), 01 Civ. 7342, 2003 WL 1807148, at *4 (S.D.N.Y. Apr.4, 2003) (holding that a foreign defendant was not present in New York for the purposes of jurisdiction simply because it engaged in financing transactions there) (citing *Clarke v. Fonix Corp.,* No. 98 Civ. 6116 (RPP), 1999 WL 105031, at *5 (S.D.N.Y. Mar.1, 1999) (reasoning that "[r]aising financing is not a form of 'doing business' for the purpose of

[New York's long arm statute]; if it were, then almost every company in the country would be subject to New York's jurisdiction")); *see also Crucible Ventures, Inc. v. Futuresat Indus., Inc.,* No. 88 Civ. 4251 (MJL), 1990 WL 16140, at *2 (S.D.N.Y. Feb.15, 1990) (questioning "whether the solicitation and occasional execution of business loans ..., without more, could ever constitute 'doing business' for jurisdictional purposes ....") The *Crucible Ventures* Court reasoned that

> [a]s with most businesses—and in the absence of any evidence to the contrary—[the Court] presume[d] that the borrowing of money is an activity incidental to [the business'] primary business. Thus, apart from the frequency of defendant's visits [t]here, [the Court] [did] not think the solicitation of business loans ... carrie[d] the same jurisdictional weight as the solicitation of business itself (e.g. the solicitation of [business] orders).

*Crucible Ventures,* 1990 WL 16140, at *2 (citations omitted). This Court is likewise convinced that it cannot exercise jurisdiction over Minera Yanacocha because of its interaction with the IFC.

### 2. Specific Jurisdiction Under D.C.Code § 13–423 (2001)

■ Authorization for exercising specific jurisdiction over a defendant in this jurisdiction is found at D.C.Code § 13–423, which has been held to be "coextensive in reach with the personal jurisdiction allowed by the due process clause of the United States Constitution ...." [21] *Shop-*

---

21. Section 13–423 states in pertinent part:

A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's—(1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in

*pers Food Warehouse v. Moreno*, 746 A.2d 320, 329 (D.C.2000). In order to meet its burden of proving the existence of specific jurisdiction under § 13–423(a)(1), a plaintiff must demonstrate that (1) the defendant transacted business in the District of Columbia, (2) that the cause of action arises from the business transacted in the District, and (3) that the "defendant had minimum contacts with the District of Columbia such that the Court's exercise of personal jurisdiction would not offend 'traditional notions of fair play and substantial justice.'" *DSMC*, 273 F.Supp.2d at 20 (quoting *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154); *see also Jacobsen*, 201 F.Supp.2d at 104; *Formica v. Cascade Candle Co.*, 125 F.Supp.2d 552, 553 (D.D.C.2001).

"A corporation transacts business within the District only if the business is of a 'substantial character.'" *World Wide Minerals*, 116 F.Supp.2d at 106. Trade association participation in the District by a non-resident defendant does not satisfy the test for the exercise of personal jurisdiction of non-residents absent a showing that it is "integral to the conduct of [the defendant's] business." *Id.* (quoting *Armco Steel Co., L.P. v. CSX Corp.*, 790 F.Supp. 311, 320 (D.D.C.1991)). However, physical presence in the District is not a prerequisite to finding that a defendant transacted business here "if the defendant's conduct is aimed at or has an effect in the forum state." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1349 (D.C.Cir.2000) (quoting *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir.1998)). But, the Circuit Court held in GTE that conclusory allegations by the plaintiff that it lost revenue as a consequence of the defendant's actions

that occurred outside the District of Columbia are insufficient to show an effect in the District. *Id.; see also United States v. Ferrara*, 847 F.Supp. 964, 967–68 (D.D.C. 1993) (holding that impact in the District resulting from the defendant's conduct that occurred outside the District must be deliberate, not incidental).

In order for the plaintiffs' claims to arise from business transacted in the District by the defendant, the plaintiffs must demonstrate "that the claim raised [has] a discernible relationship to the 'business' transacted in the District." *Shoppers*, 746 A.2d at 329 (quoting *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). A discernible relationship exists when the nonresident defendant has minimum contacts with the District "such that [the non-resident] should reasonably anticipate being haled into court [here]." *Id.* (quoting *Trerotola v. Cotter*, 601 A.2d 60, 64 (D.C. 1991) (quoting *World Wide Volkswagen*, 444 U.S. 286 at 297, 100 S.Ct. 559).)

"[S]ection 13–423(a)(1) is coextensive in reach with the personal jurisdiction allowed by the due process clause of the United States Constitution . . . ." *Id.* The due process clause allows this Court to exercise personal jurisdiction over a nonresident defendant who has minimum contacts with the District of Columbia. *Id.*

[T]he minimum contacts principle requires [the Court] to examine the quality and nature of the nonresident defendant's contacts with the District and whether those contacts are voluntary and deliberate or only random, fortuitous, tenuous and accidental; . . . where a nonresident defendant has purposeful-

---

any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia; . . . (b) When ju-

risdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him.

ly availed itself of the benefits and protections of the District in engaging in a business activity in the forum jurisdiction, it is fair and reasonable to expect it to anticipate being sued in that jurisdiction . . . .

*Id.* In assessing the reasonableness of the factors a plaintiff claims merit a court exercising personal jurisdiction over an alien defendant, due process requires the court to assess whether the defendant could reasonably anticipate litigation with the plaintiff in the District as a result of its activities, whether the plaintiff is a resident of the District, and whether it would be fair and reasonable to force the alien defendant to litigate here. *Id.* In *Shoppers,* the District of Columbia Court of Appeals found that a Maryland corporation which advertised in The Washington Post had the necessary minimum contacts with the District "by purposefully directing advertisements for its Maryland and Virginia stores at a potential customer base in the District of Columbia . . . ." *Id.* at 331. Therefore, the court concluded that the defendant in *Shoppers* " 'should reasonably [have] anticipate[d] being haled into court [in the District]' by a customer from the District who received an injury in one of its Maryland stores." *Id.* (quoting *World Wide Volkswagen,* 444 U.S. at 297, 100 S.Ct. 559).

Conversely, the plaintiff fell short of meeting its burden of proving personal jurisdiction in *Formica,* 125 F.Supp.2d at 554–55. There, the Court found that the "defendant's contacts with the District [were] far less numerous and far less significant [than were the contacts of the defendant in *Shoppers* ] . . ., [because the] defendant [did] not own property in the District, [did] not have any offices or employees, agents, or other representatives in the District, [did] not solicit any business in the District, and [did] not engage in any advertising directed to the citizens and businesses of the District." *Id.* Moreover, the *Formica* court noted that although the District has a significant interest in furnishing its own residents with a convenient forum to seek redress for injuries sustained as a result of the actions of nonresidents, "[w]here the plaintiff is not a resident of the forum . . . the District's interest in having [the] case litigated within its borders is minimal." *Id.* at 556. The *Formica* court further reasoned that "it is unreasonable for [the] defendant to expect to be haled into a District of Columbia court with respect to a matter brought by a Maryland plaintiff relating to an injury that . occurred in Maryland . . . . [because the] defendant must have had 'fair warning' that it would be sued by someone such as [the] plaintiff in the District of Columbia." *Id.* (citation omitted). And significant to this case is " '[t]he unique burdens placed upon one who must defend oneself in a foreign legal system [, which] should [be given considerable] weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.' " *Asahi Metal Ind. Co., Ltd. v. Superior Court of Cal.,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

The government contacts exception, which has application when a challenge to personal jurisdiction is at issue, "precludes the assertion of personal jurisdiction over a non-resident whose only contact with the District of Columbia is with Congress or a federal agency." *Dooley v. United Techs. Corp.,* 786 F.Supp. 65, 75 (D.D.C.1992); *World Wide Minerals,* 116 F.Supp.2d at 105, (this doctrine excludes from jurisdiction consideration of defendant's contacts with federal instrumentalities). The underlying objectives of the government contacts exception are twofold.

First, . . . protecting the important First Amendment right to petition the nation-

al government for the redress of grievances, which [would be] impermissibly burdened by a "long arm" statute that permitted such contacts, standing alone, to subject a non-resident to the jurisdiction of local courts. Second, ... absent the government contacts exception, subsection 423(a)(1) would effectively transform the District of Columbia into a national judicial forum whose courts would rapidly be inundated with lawsuits
. . . .

*Nat'l Coal Ass'n v. Clark*, 603 F.Supp. 668, 671 (D.D.C.1984) (internal citations omitted). In *Naartex Consulting Corp. v. Watt*, 722 F.2d 779 (D.C.Cir.1983), the Circuit Court held that the government contacts exception applied to a non-resident defendant who operated an office in the District for the purpose of "monitor[ing] legislative and regulatory matters and maintain[ing] official contacts with the Congress and the executive branch." *Id.* at 786 (quotations omitted). Similarly, in *Fandel,* the Circuit Court found that "continuing relationships with the State Department and other executive agencies of the United States Government, with diplomatic missions accredited to that Government," came within the government contacts exception. *Fandel,* 345 F.2d at 88; *World Wide Minerals,* 116 F.Supp.2d at 105–06 (noting that "[c]ourts have refused to extend this exception to embassy meetings when the non-resident defendant was pursuing a proprietary interest."); *Dooley,* 786 F.Supp. at 75 & n. 9 (refusing to extend the government contacts exception "to cover meetings with embassies or foreign dignitaries in Washington" because

the defendant's visits "did not involve simply meetings with government officials," but included visits and the conduction of business). Additionally, membership in trade associations falls within the government contacts exception. *World Wide Minerals,* 116 F.Supp.2d at 106. For example, the defendant in *World Wide Minerals* founded The American Uzbekistan Chamber of Commerce and served on the board of directors for the Chamber of Commerce in the District. *Id.* A member of this Court held that such contacts with the District of Columbia fell within the government contacts exception because it "would surely come as a surprise to the members of many trade associations having offices here that their membership counted as intrastate business for jurisdictional purposes." *Id.* (quoting *Inv. Co. Inst. v. United States,* 550 F.Supp. 1213, 1217 & n. 6 (D.D.C.1982)).

### a. Personal or Specific Jurisdiction over the Newmont Defendants [22]

■ Here, the plaintiffs argue that the Newmont defendants are subject to personal jurisdiction in the District of Columbia because they transact business here pursuant to the District's long arm statute, which is coextensive with the due process "minimum contacts" requirement. Pls.' Opp. at 10–12. The Newmont defendants, according to the plaintiffs, transact business in the District because their employees have traveled to this jurisdiction on a number of occasions "to meet with foreign embassies, IFC personnel, trade associations, business counsels, etc.," concerning their mining operations, Pl.'s Supp. at 5,[23] and because they obtain funding from the

---

**22.** As already indicated, the Newmont defendants are Newmont USA, Ltd., Newmont Peru, Ltd., and Minera Yanacocha S.R.L. Pls.' Opp. at 1.

**23.** According to the plaintiff, "[v]isits to [the] IFC concerned financing and accounting rela-

tive to gold mining operations in Peru. Trade association travel involved leadership, management, and direction of the trade associations. Business council meetings were made to promote Newmont and/or to secure mining rights." Pls.' Supp. at 5.

IFC, which presumably is used to conduct its mining activities at the Yanacocha site under the supervision of Minera Yanacocha. Pl.'s Opp. 10–12. The plaintiffs rely on *Kowal v. MCI Communications. Corp.*, 16 F.3d 1271, 1276 (D.C.Cir.1994) as support for their position that they "are entitled to 'the benefits of all inferences that can be derived from the facts alleged.'" Pls.' Supp. at 3. And by affording them that benefit here, the plaintiffs opine that it is reasonable for the Court to infer that the funds received from the IFC to develop the Yanacocha mines were partially used to pay AGS for the services it provided at the Yanacocha mines. Moreover, the plaintiffs contend that it is reasonable to infer that the services provided by AGS were in turn utilized by the Newmont defendants' employees and consultants as well as the IFC personnel who visited the mines. *Id.* at 5. It is this tenuous connection that the plaintiffs rely on to illustrate the purported discernable relationship between their claims and the Newmont defendants' contacts with the District in their attempt to satisfy the District of Columbia long arm statute. *Id.* at 11.

The Newmont defendants challenge the existence of personal jurisdiction because "the plaintiffs' claims plainly do not arise out of any of the defendants' contacts with the District." Newmont's Mem. at 7. Specifically, the Newmont defendants contend that no evidence has been proffered by the plaintiffs to show that it "purposefully and deliberately" solicited District residents ... or that the plaintiffs' claims have any relation to any of the defendants' contacts with the District." Newmont's Mem. at 6.

Furthermore, according to the Newmont defendants, the plaintiffs have failed to demonstrate that funds received from the IFC in the District were used to pay AGS for its services, and more particularly, how the plaintiffs' claims arise from such payments. Newmont's Reply at 6–7.

The Court agrees that the Newmont defendants are not subject to personal jurisdiction in the District of Columbia. Here the plaintiffs must make a *prima facie* showing of personal jurisdiction over the defendants to prevail on a challenge pursuant to 12(b)(2). In assessing whether this showing has been made, facts "asserted by the plaintiff ... [are] presumed to be true unless directly contradicted by affidavit." *DSMC*, 273 F.Supp.2d at 20. In grouping all of the Newmont defendants together collectively, the plaintiffs fail to acknowledge that it was Minera Yanacocha that received funds from the IFC, not Newmont USA. Pls.' Opp., Ex. 5 (Minera Yanacocha (Peru) Project Brief explaining the IFC's role and the project's development).[24] In this regard, the IFC refers to Minera Yanacocha as a separate entity and reports on its website that its financing was made to Minera Yanacocha directly. *Id.* Moreover, the evidence presented by the plaintiffs does not support the existence of a "discernible relationship" between the IFC's funding of the Yanacocha mines and the payments made to AGS for servicing the Yanacocha mines. Furthermore, just as the defendant in *Naartex*, 722 F.2d at 786, whose contacts in the District of Columbia were with government entities, any contacts Newmont USA had with the IFC in connection with Min-

---

**24.** Merely because Minera Yanacocha is part of a joint venture in which Newmont USA is a 51.35% owner "does not create an identity of corporate interest between [Newmont USA and Minera Yanacocha], or create the relationship of principal and agent, or representa-

tive, or alter ego between the two." *Diamond Chem.*, 268 F.Supp.2d at 18 (referencing William Meade Fletcher, Fletcher Cyclopedia of the Law of Private Corporations § 25, at 304 (rev.perm. ed.1983)).

era Yanacocha falls within the government contacts exception. Particularly, Ms. Donnelly's membership activities in The American Uzbekistan Chamber of Commerce and NAKBC are likewise excluded from the court's jurisdictional analysis under the government contracts exception. As noted by the Court in *World Wide Minerals,* "membership in a trade organization also qualifies as 'government contacts' ... [because] '[i]t would surely come as a surprise to the members of the many trade associations having offices here that their membership counted as intrastate business for jurisdictional purposes,'" 116 F.Supp.2d at 106 (citations omitted). Moreover, as noted above, the IFC is part of the World Bank, to which many nations are members, including the United States. *About IFC, at* http://www.ifc.org/about (last visited Nov. 13, 2004).[25] Thus, even if Newmont USA's contacts could be appropriately considered in assessing whether they satisfy the transacting business requirement of D.C.Code § 13–423(a)(1), the plaintiffs have failed to meet this burden because they have made only conclusory statements to support the alleged existence of a "discernible relationship" between the defendants and the District of Columbia. *GTE,* 199 F.3d at 1349. For example, the plaintiffs posit that "[b]ecause funding for [the] Yanacocha mines was obtained from [the] District-based IFC under sponsorship of Newmont, it can be *reasonably inferred* that the money was used to make payments to AGS and various other camp support vendors emanated from Washington, D.C." Pls.' Opp. at 11

(emphasis added). Unlike the plaintiff in *Shoppers,* who submitted numerous items of evidence in the form of newspaper advertisements distributed in the District to show their relation to his injuries, the plaintiffs here do not submit any evidence to show how meeting with IFC personnel and the acquisition of funds from the IFC relate to the injuries they allegedly suffered in Peru. Pls.' Opp. at 10–12.

Moreover, this Court's exercise of personal jurisdiction over the Newmont defendants would not comport with due process because non-forum companies who have contacts with the IFC in the District to secure loans for non-District projects can not reasonably foresee being haled into this jurisdiction's courts as a result of such activity. *See In re Ski Train Fire in Kaprun, Austria,* 2003 WL 1807148, at *4; *Clarke,* 1999 WL 105031, at *5; *Crucible Ventures,* 1990 WL 16140, at *2. To conclude otherwise would inundate the courts in this jurisdiction with the filing of countless lawsuits that concern events about which the District has no interest. *Shoppers,* 746 A.2d at 331; *Clark,* 603 F.Supp. at 671. None of the plaintiffs are residents of the District of Columbia or even United States citizens, Am. Compl. ¶¶ 6–18, and therefore, the District of Columbia's "legitimate interests in th[is] dispute [is] considerably diminished." *Formica,* 125 F.Supp.2d at 556 (quoting *Asahi Metal Indus. Co., Ltd.,* 480 U.S. at 114, 107 S.Ct. 1026); *see also Shoppers,* 746 A.2d at 328 ("A State generally has a manifest interest in providing its residents with a

25. As the Newmont defendants note:
"The IFCa member of the World Bank Groupis an international lending institution created pursuant to an 'Article of Agreement' among a number of nations, including the United States. *See Int'l Fin. Corp. v. GDK Sys., Inc.,* 711 F.Supp. 15, 17 (D.D.C. 1989) (discussing the IFC structure). The IFC's capital is provided by the member

countries, and its corporate powers are vested in a Board of Governors appointed by those countries. *About IFC,* available at *http://www.ifc.org.* The United States is a major shareholder in the IFC, and the Secretary of the Treasury serves on the IFC's Board of Governors. *Int'l Fin. Corp.,* 711 F.Supp. at 17." Newmont's Reply at 3.

convenient forum for redressing injuries inflicted by out-of-state actors"). In such situations, the relationship between a nonresident defendant and the forum must be such that it is reasonable to require the defendant to defend against the particular lawsuit. *Id.* at 555–56. In *Formica,* the plaintiff was a resident of Maryland when he purchased the product that allegedly caused his injury, and the injury was also sustained in Maryland. *Id.* at 555. Accordingly, the *Formica* Court concluded that the Connecticut defendant did not have "fair warning" that it would be sued by a Maryland resident in the District of Columbia. *Id.* Thus, as was the situation in *Formica,* the District's interest in having this case litigated within its borders is minimal. *Id.* Furthermore, because most of the Newmont defendants' contacts with the District of Columbia must be excluded from jurisdictional consideration under the government contacts exception and the plaintiffs have not otherwise carried their burden of showing sufficient minimum contacts to satisfy due process, the Newmont defendants are not subject to personal jurisdiction in the District of Columbia. *Shoppers,* 746 A.2d at 331.

### b. Personal Jurisdiction over Sodexho Alliance

■ The plaintiffs contend that Sodexho Alliance is subject to personal jurisdiction in the District of Columbia because: (1) its subsidiary Sodexho, Inc., a Delaware company, maintains catering operations at the FBI headquarters in Washington, D.C., Am. Comp. ¶ 17; (2) Hoovers online business reports indicates that Sodexho Alliance conducts "river and harbor dinner cruises on a fleet of more than 40 boats in cities such as … Washington, D.C.," Pls.' Opp., Ex. 1H; (3) Sodexho Alliance en-

tered into an Assistance Agreement with Marriott International, Inc. to form SMS on March 27, 1998, to provide "catering and site support services," marketing," and "management and administration," Pls.' Supp. at 2, Ex. 2 (Assistance Agreement between Sodexho Alliance and Marriott International, Inc.) and SMS has an office in the District at 2900 Van Ness Street, N.W., where it "conducts business activities, or substantially benefits from business operations" in the District, *id.;* (4) Sodexho Alliance entered into a Joint Venture Agreement with the Correction Corporation of America ("CCA") in 1994, which manages prison facilities, Pls.' Opp., Ex. 15 at 2; and (5) Sodexho Alliance executive committee members made 81 trips to the United States from 1999–2002, 41 of which were to Gaithersburg, Maryland. Pls.' Supp. at 4.

Sodexho Alliance responds that it is not subject to personal jurisdiction in the District of Columbia because it does not do business here and the plaintiffs' claims do not arise out of its contacts with the District of Columbia. Sodexho's Mot. at 1. Sodexho Alliance represents that it "is a … French limited liability company, organized under the laws of France with its principal place of business in France." Sodexho's Mem. at 4. Sodexho Alliance states that it owns no real property in the District, has no mailing address or telephone listing in the District, is not licensed or qualified to do business in the District, does not have an office, director, employee, agent, or representative domiciled in the District, has never filed or been required to file taxes in the District, does not maintain a bank account in the District and has not committed a tort in the District. Pls.' Supp., Ex. 1 (Herbert–Jones Aff.) ¶¶ 3–12, 16.[26] Furthermore, Sodexho Alliance ar-

---

26. In addition, even though AGS fails to assert in its complaint or in its opposition to the

defendants' dismissal motions specific jurisdiction as a basis for this Court being able to

gues that the contacts its subsidiaries have with the District cannot be imputed to it for jurisdictional purposes.[27] Specifically, Sodexho Alliance contends that the plaintiffs may not use the activities of Sodexho Alliance's subsidiary SMS, or any benefits received from SMS' use of its trademark, to establish the requisite contacts with the District for jurisdictional purposes. Sodexho's Reply at 10–12. Accordingly, it is Sodexho Alliance's position that the dinner cruise boats the plaintiffs reference as a basis for establishing its contacts with the District are operated by an indirect subsidiary known as Spirit Cruises, which has no connection to the plaintiffs' claims. *Id.* at 13. With respect to the joint venture Sodexho Alliance entered into with the CCA, Sodexho Alliance notes that the "Joint Venture Agreement involved the development of [a] prison management business in a geographic territory that specifically excluded the United States." *Id.* This agreement was signed on behalf of Sodexho Alliance in France and was terminated in 2001. *Id.* Thus, contrary to the plaintiffs' assertions, Sodexho Alliance contends that it has never executed a contract with the CCA within the District of Columbia or for the CCA to perform services in the District. *Id.*[28]

On this record, this Court also concludes that Sodexho Alliance is not subject to personal jurisdiction in the District of Columbia because it is not "doing business"

here. In order for Sodexho Alliance to be subject to personal jurisdiction in the District based on the actions of its subsidiaries, the plaintiffs must show that subsidiaries are the alter ego of Sodexho Alliance. *Material Supply Int'l, Inc. v. Sunmatch Indus. Co., Ltd.,* 62 F.Supp.2d 13, 20 (D.D.C.1999) Interestingly, however, the plaintiffs do not allege that Sodexho Inc., Sodexho Pass, Spirit Cruises, or SMS are alter egos of Sodexho Alliance. The plaintiffs also offer no evidence to show how Sodexho Alliance controls these subsidiaries or shares funds with them. Without more, Sodexho Alliance's authorization for SMS to use its trademark and to share revenue with SMS pursuant to their joint venture agreement are insufficient to show a unity of interest for jurisdictional purposes. *See Diamond Chem.,* 268 F.Supp.2d at 7 (noting that the District of Columbia Court of Appeals has stated that piercing the corporate veil requires showing that " 'the corporation is not only controlled by those persons [alleged to be alter egos of the corporation], but also that the separateness of the persons and the corporation has ceased and ... an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice' "). Furthermore, Sodexho Alliance does not share physical office space with its subsidiaries. And travel by Sodexho Alliance's executive committee members to Gaithersburg, Maryland is devoid of significance on the

exercise jurisdiction over Sodexho Alliance, Sodexho Alliance nonetheless contends that this court cannot exercise specific jurisdiction over it because it did not transact any business in the District that provides the basis for pursuing the claims that underlie the dispute in this case. Moreover, Sodexho Alliance contends that it does not have the minimum contacts with the District of Columbia necessary to satisfy the requirement of due process. Sodexho's Reply at 7–9.

**27.** Sian Herbert–Jones avers that "Sodexho Alliance maintains separate books and records and separate identities from ... [Sodexho Peru] and from its operating subsidiaries in the United States. Sodexho Alliance and its operating subsidiaries in the United States maintain separate boards of directors and separate bank accounts." Pls.' Supp., Ex. 1 (Herbert Jones Aff.) ¶ 14.

**28.** The contract with the CCA did not include performance of services by Sodexho Alliance in the United States. Sodexho Reply at 13.

question of whether the company has minimum contacts with the District. Therefore, the only other potential contacts Sodexho Alliance has with the District is its contract with the CCA. But the plaintiffs' assertions that Sodexho Alliance's agreement with the CCA for the CCA to operate prison facilities—one being a facility that was located in the District—is a jurisdictional contact Sodexho Alliance has with the District is directly contradicted by the Herbert–Jones affidavit which states that the agreement only covered activities that would occur outside of the United States. Herbert–Jones Supp. Aff. ¶ 3. Accordingly, it would also be unreasonable for this Court to exercise personal jurisdiction over Sodexho Alliance, a French corporation, for the actions of its Peruvian subsidiary allegedly committed in Peru.

### c. Personal Jurisdiction over Sodexho Peru

■ The only theory advanced by the plaintiffs concerning why this Court can exercise personal jurisdiction over Sodexho Peru is that it is the alter ego of Sodexho Alliance. In fact, the plaintiffs only reference on the subject is the allegation in their complaint that "Sodexho Peru acts as the alter ego of Sodexho Alliance." Am. Compl. ¶ 17. As indicated already, because Sodexho Alliance is not subject to personal jurisdiction in the District, jurisdiction over Sodexho Peru cannot be based on the alter ego theory. *Material Supply*, 62 F.Supp.2d at 19. Moreover, the plaintiffs offer no evidence to support their allegations that Sodexho Peru is the alter ego of Sodexho Alliance. Further, Sodexho Peru owns no real property in the District, has no mailing address or telephone listing in the District, is not licensed or qualified to do business in the District, does not have an office, director, employee, agent or representative domiciled in the District, has never filed or been required

to file taxes in the District, does not maintain a bank account in the District and has committed no tort in the District. Sodexho's Mem. at 4–5. Therefore, Sodexho Peru is not subject to personal jurisdiction in the District of Columbia.

### 3. Personal Jurisdiction Pursuant to 18 U.S.C. § 1965

■ The plaintiffs argue that an additional basis for exercising jurisdiction over the defendants is the nationwide service of process provision of the RICO statute, 18 U.S.C. § 1965(d), which provides that "any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs." *Id.* The plaintiffs rely on *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 369 (3rd Cir.2002), which construed the reach of a federal statute for personal jurisdiction purposes when the statute provides for nationwide service of process, concluding that:

> where the plaintiff's claim is based on a federal statute authorizing nationwide service of process ... the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole .... the aggregation of the national contacts of an alien defendant is "neither unfair nor unreasonable" under the Fifth Amendment in light of the fact that a federal court sits as a unit of the national government and, therefore, the territorial limitations that apply to the exercise of state court jurisdiction—or, ... federal jurisdiction in diversity cases ... are inapposite. Where Congress has spoken by authorizing nationwide service of process, ... the jurisdiction of a federal court need not be confined by the defendant's contacts with the state in which the federal court sits ....

*Id.* at 369 (citations omitted). Relying on the Newmont defendants' contacts with the IFC and their trade and business association participation, the plaintiffs maintain that they have sufficient minimum contacts with the United States to justify the Court's exercise of personal jurisdiction over them pursuant to the nationwide service of process provisions of 18 U.S.C. § 1965. Pls.' Opp. at 12–15. Moreover, although the plaintiffs acknowledge that "the underlying events may have had no relationship with the District of Columbia," they opine that the Court can also exercise personal jurisdiction over the Sodexho defendants because they allegedly conspired with the Newmont defendants to violate the RICO statute. Pls.' Opp. at 13–14.

In opposition to the plaintiff's position, the Newmont defendants maintain that personal jurisdiction cannot be based on the RICO statute because Minera Yanacocha and Newmont Peru were served with process by a private attorney in Lima, Peru, which is not in compliance with § 1965 and because Newmont USA does not have minimum contacts with the District of Columbia. Newmont's Reply at 7. Newmont Peru further argues that in accordance with its position that Newmont USA's contacts with the District are either insufficient or excepted, its lack of minimum contacts with the District preclude jurisdiction over it pursuant to RICO's nationwide service of process provision. *Id.*[29] Sodexho Alliance and Sodexho Peru also are not subject to personal jurisdiction here because they were served abroad and therefore were not served properly under the RICO statute. Sodexho's Mem. at 5 n. 3. Thus, in order to establish personal jurisdiction under § 1965, the plaintiff must establish that the Sodexho defendants fall within the reach of the D.C. long arm statute, which as previously discussed, they have failed to do.

The District of Columbia Circuit has not yet addressed the issue of whether a national contacts test may be employed as the basics for this Court to exercise jurisdiction over non-resident defendants pursuant to the nationwide service of process provision of the Federal RICO statute, 18 U.S.C. § 1965. *World Wide Minerals,* 116 F.Supp.2d at 107. Two members of this Court have taken different positions on the issue. *Compare World Wide Minerals,* 116 F.Supp.2d at 107–08 and *Dooley,* 786 F.Supp. at 71. The *Dooley* Court held that it could exercise personal jurisdiction over the defendants there pursuant to § 1965(d) of the RICO statute because they resided and were served in the United States. The Court reasoned that

> [u]nder this section, the plaintiff's *prima facie* burden [of establishing personal jurisdiction] is met by showing that a defendant has contacts with the United States. Minimum contacts with the forum state, as required under the traditional long-arm jurisdiction analysis, is not necessary. A defendant's contacts with the United States is sufficient to satisfy the requirement of due process.

*Id.* at 71 (citation omitted).[30] The Court in *World Wide Minerals,* declined to follow

---

**29.** Newmont USA also notes, but does not contest, its improper service of process resulting from the Complaint and Summons [being] left with a receptionist at the law firm of Shea & Gardner, which is not a proper method of service under Rule 4(h) of the Federal Rules of Civil Procedure. See Newmont's Mem. at 5 n. 4 & Ex. C (Donnelly Decl.) ¶ 12.

**30.** *See also Pinker,* 292 F.3d at 369 (relying on "dicta" from its prior cases the Third Circuit held "that the relevant forum for analyzing the extent of the defendant's contacts is the United States as a whole ... [because] the aggregation of the national contacts of an alien defendant [is] 'neither unfair nor unreasonable' under the Fifth Amendment in light of the fact that a federal court sits as a unit of

*Dooley* for several reasons. *World Wide Minerals,* 116 F.Supp.2d at 107–108. Finding "substantial similarity" between the Clayton Act's service of process provisions, 28 U.S.C. § 1391(b) & (c), and the service of process provisions of the RICO statute, 18 U.S.C. § 1965(a), (d), the *World Wide Minerals* Court noted that "[t]he ruling in this circuit in *GTE New Media Services,* 199 F.3d 1343 (D.C.Cir.2000), on the Clayton Act postdates *Dooley,* and suggests that a national contacts test might not apply." *Id.* at 107–108. Moreover, the Court found that "there is strong support to reject nationwide jurisdiction in the Second Circuit." *Id.* at 108 (citing *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.,* 138 F.3d 65, 70 (2nd Cir.1998)). The Court pointed out that the Second Circuit concluded that "the service provisions of the RICO statute must be read together in order to be coherent." *Id.* (citing *PT United Can,* 138 F.3d at 70) (concluding that for a court to exercise personal jurisdiction over defendants pursuant to § 1965, at least one defendant must have minimum contacts with the forum). Construing the four subsections of § 1965 of the RICO statute, the *World Wide Minerals* Court held that subsection (d) "should not invalidate the division in (a) and (b) between resident and non-resident defendants. The statute seems to provide for nationwide jurisdiction only when one of the defendants has minimum contacts with the forum." *Id.* Therefore, because none of the defendants resided, had an agent, or transacted affairs in the forum jurisdiction—circumstances which the *World Wide Minerals* Court concluded were "analogous to having minimum con-

tacts within the district"—the Court held that the defendants were not "subject to personal jurisdiction in the District of Columbia ...." *Id.* This Court agrees with the ruling of the *World Wide Minerals* Court and will therefore employ the analysis utilized in that case. It is also important to note that it is well settled that § 1965 "does not provide for service of process in a foreign country." *Avianca, Inc. v. Corriea,* 705 F.Supp. 666, 684 (D.D.C.1989) (citation omitted). "Thus, authority for ... allowing alternative service [of process] upon [the defendants] ... must be found, if at all, in the District of Columbia long arm statute." *Id.*

■ This court concludes that neither group of defendants in this case are subject to personal jurisdiction in the District of Columbia pursuant to § 1965. As noted already, § 1965 requires (1) that at least one defendant have minimum contacts with the District of Columbia and (2) that any additional foreign defendants must be served with process pursuant to the District's long arm statute, D.C.Code § 13–423. *Avianca,* 705 F.Supp. at 684. With respect to Newmont USA, the plaintiffs have failed to meet their burden of proving that Newmont USA has minimum contacts with the District to the extent that it could have reasonably foreseen being haled into court in this jurisdiction. Thus, none of the Newmont defendants are subject to the exercise of personal jurisdiction here because none of them have minimum contacts with the District. Moreover, the Sodexho defendants, Minera Yanacocha and Newmont Peru were all served abroad and are therefore not subject to personal jurisdiction under the District's long arm

the national government ....") (citations omitted); *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.,* 119 F.3d 935, 943 (11th Cir.1997) (reiterating holding that when "assessing the Fifth Amendments constraints on the use of a federal statute's nationwide

service of process provision 'due process requires only that a defendant in a federal suit have minimum contacts with the United States.'") (quoting *F.T.C. v. Jim Walter Corp.,* 651 F.2d 251, 256 (5th Cir.1981)).

statute. Therefore, personal jurisdiction pursuant to the RICO statute cannot be exercised over any of the defendants.

### 4. Personal Jurisdiction Based on the Conspiracy Theory

■ A plaintiff seeking to meet its burden of demonstrating that a court may exercise jurisdiction over foreign defendants under a conspiracy theory must present a "particularized pleading of the conspiracy as well as the overt acts within the forum taken in furtherance of the conspiracy." *DSMC*, 273 F.Supp.2d at 20; *see World Wide Minerals*, 116 F.Supp.2d at 108 ("For conspiracy jurisdiction to function there must be a substantial act within the forum."); *Dooley*, 786 F.Supp. at 78 ("[M]ere speculation that the nonresident defendants' are co-conspirators [is] insufficient to meet plaintiff's *prima facie* burden."). On the other hand, a former member of this court in *Mandelkorn v. Patrick*, 359 F.Supp. 692, 695–697 (D.D.C. 1973), found that personal jurisdiction could be exercised over non-resident defendants based on their alleged status as co-conspirators because overt acts of the conspiracy committed in the District of Columbia were specifically alleged in the complaint, which had not been contradicted by the defendants. The *Mandelkorn* Court "emphasized, however, that the situation would be quite different on this point, if the allegations of the complaint were controverted or if the facts should develop otherwise than as alleged." *Id.* at 697. Accordingly, a different result was reached by the Circuit Court in *First Chicago Int'l v. United Exch. Co., Ltd.*, 836 F.2d 1375 (D.C.Cir.1988), where the alleged conspiracy was challenged by the defendants and the Court concluded that the plaintiff had failed to meet its burden of establishing personal jurisdiction based on the existence of a conspiracy relationship. *Id.* at 1378. This deficiency resulted from the plaintiff's failure to adduce any "concrete evidence in the record indicating there was a common plan—in the District or anywhere else—to defraud [the plaintiff] and that [any of the defendants] conspired and acted to further that plan." *Id.* Thus, the plaintiff in *First Chicago* failed to " 'allege specific acts connecting [the] defendant with the forum,' " because " 'the bare allegation' of conspiracy or agency [was] insufficient to establish personal jurisdiction." *Id.* at 1378–79 (quoting *Greenspun v. Del. E. Webb Corp.*, 634 F.2d 1204, 1208 n. 5 (9th Cir.1980)).

■ The plaintiffs posit that because the Sodexho defendants conspired with the Newmont defendants to violate the RICO and Lanham Acts the Sodexho defendants are therefore subject to personal jurisdiction in the District under the civil conspiracy theory. Pls.' Opp. at 15–16. As grounds for their position, the plaintiffs contend that because the Newmont defendants are subject to personal jurisdiction in the District and "the effects of the conspiracy were felt within U.S. borders," the Sodexho defendants are subject to personal jurisdiction in the District because of its involvement in the conspiracy. Pls.' Opp. at 15.[31] The Sodexho defendants challenge the plaintiffs' conspiratorial theory on the grounds that it is based on nothing more than "bald allegations of conspiracy" and that the plaintiffs have failed to allege that an overt act occurred within

---

**31.** The plaintiffs do not explain how the United States was impacted by this alleged conspiracy. Instead, they cite to paragraph 63 of the Amended Complaint which states that "AGS and the former employees thereof have been damaged and are currently being damaged." The plaintiffs also cite to paragraph 117 of its Amended Complaint which states that the goals of the conspiracy were to "eliminat[e] AGS as a competitor of Sodexho ... [and] to promot[e] the business of Sodexho to sell its service to Yanacocha and/or others."

the District, which is a prerequisite to the exercise of personal jurisdiction based on the conspiracy theory. Sodexho's Reply at 14–15. The Sodexho defendants are correct.

Similar to the plaintiffs in *First Chicago,* who failed to present "concrete evidence ... indicating there was a common plan," the plaintiffs have failed to present evidence that establishes the existence of a conspiracy to replace AGS as the service provider at the Yanacocha mines. *First Chicago,* 836 F.2d at 1378. Rather, the plaintiffs have made "bare allegations" that such a conspiracy existed.[32] And although the plaintiffs allege the commission of an overt act committed in furtherance of the conspiracy—the alleged kidnaping of former AGS employees by Newmont and Sodexho employees—this act occurred in Peru, not in the District of Columbia. Am. Compl. ¶¶ 58–59. Moreover, the plaintiffs' statement that "the effects of the conspiracy were felt within U.S. borders" is insufficient support for their conspiracy theory because this claim is also totally unsupported by any evidence. Pls.' Opp. at 15. Accordingly, this Court cannot exercise personal jurisdiction over the Sodexho defendants based on their alleged conspiratorial relationship with the Newmont defendants.

### 5. Personal Jurisdiction Based on Alter Ego Status

"Ordinarily, a corporation's contacts with a forum may not be attributed to affiliated corporations." *Material Supply,* 62 F.Supp.2d at 19. "An exception exists, however, when the party which contests jurisdiction is an 'alter ego' of an affiliated party over which the court has uncontested jurisdiction; ...." *Id.* The determination of whether a subsidiary is the alter ego of a parent corporation turns on whether the parent corporation " 'so dominated the [subsidiary] corporation as to negate its separate personality.' " *Id.* at 20 (quoting *Hart v. Dep't of Agric.,* 112 F.3d 1228, 1231 (D.C.Cir.1997)); *see also Capital Bank Int'l v. Citigroup, Inc.,* 276 F.Supp.2d 72, 76 ("[A] parent-subsidiary relationship is insufficient to support jurisdiction unless 'parent and subsidiary are not really separate entities.' ") (citation omitted). The alter ego determination is a "question of law to be decided by the court." *Material Supply,* 62 F.Supp.2d at 19–20. In assessing the Courts authority to exercise personal jurisdiction over a party pursuant to the alter ego status doctrine, it must evaluate "(1) whether there is 'such unity of interest and ownership that the separate personalities of the [subsidiary] and [parent] no longer exist'; and (2) whether an inequitable result will follow if the court treats the [subsidiary's] allegedly wrongful acts as those of [the subsidiary] alone." *Id.* at 20 (quoting *Smith v. Washington Sheraton Corp.,* 135 F.3d 779, 786 (D.C.Cir.1998); *Camacho v. 1440 Rhode Island Ave. Corp.,* 620 A.2d 242, 248–49 (D.C.1993) (citation omitted);

---

**32.** The allegations set forth in the plaintiffs' Amended Complaint include the following: "the relationship between [AGS and Minera Yanacocha] began to break down due to, *inter alia,* an unlawful conspiracy between Sodexho and Newmont to remove AGS as Yanacocha's primary food and maintenance service supplier," Am. Compl. ¶ 37; "[u]pon information and belief, [Newmont's complaints about the quality of the food and other services] were unlawfully prompted by Sodexho, Mi-

chael Mitchell, and others who were attempting to effect replacement of AGS as Yanacocha's primary food service and hospitality vendor," Am. Compl. ¶ 41; and "[u]pon information and belief, Sodexho ... and others unlawfully ... conspired to prompt and encourage Newmont to reverse its 15 month long course of conduct of sealing advanced monthly invoices for the sole purpose of preventing AGS from fulfilling its obligations under the ... contract," Am. Compl. ¶ 44.

see *Diamond Chem.*, 268 F.Supp.2d at 7; *see also Vuitch v. Furr*, 482 A.2d 811, 815 (D.C.1984)) (finding alter ego status when "adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice.").

Unity of interest is measured by "the nature of the corporate ownership and control; failure to maintain corporate minutes or records; failure to maintain corporate formalities; commingling of funds and assets; diversion of one corporation's funds to the other's uses; and use of the same office or business location." *Material Supply*, 62 F.Supp.2d at 20 (citing *Labadie Coal Co. v. Black*, 672 F.2d 92, 97–99 (D.C.Cir.1982)). For example, the Supreme Court refused to find a parent corporation subject to personal jurisdiction in North Carolina under the theory that its subsidiary, with jurisdictional contacts there, was its alter ego. *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925). Despite evidence that "the defendant dominate[d] the [subsidiary], immediately and completely, and exert[ed] its control both commercially and financially in substantially the same way," the *Cannon Mfg. Co.* Court decided that the two companies were "wholly independent corporations" because they maintained separate financial and transactional records. *Id.* at 335, 45 S.Ct. 250. In some cases, a subsidiary has been determined not to be the alter ego of its parent corporation even though both entities had common directors and engaged in joint marketing endeavors. *Diamond Chem.*, 268 F.Supp.2d at 9. Specifically, the *Diamond Chemical* court held that the plaintiff's evidence that the parent corporation and one of its subsidiaries shared executives, made "joint use of trademarks, and a common marketing image," and that the parent jointly promoted itself and the subsidiary and benefitted from the activities of other subsidiaries in the District of Columbia, was insufficient to establish that the subsidiary was the alter ego of the parent corporation. *Id.* at 8.

### a. Newmont Peru as the Alter Ego of Newmont USA

In assessing whether a foreign parent corporation is subject to personal jurisdiction in [the District of Columbia], "[t]he acts of a subsidiary may be imputed to the parent" where the subsidiary is "so organized and controlled, and its business conducted in such a manner, as to make it merely an agency, instrumentality, adjunct, or alter ego of [the parent]." *In re Ski Train Fire in Kaprun, Austria on November 11, 2000*, No. 03 Civ. 6351, 342 F.Supp.2d 207, at 214, 2004 WL 2260594 at *4 (S.D.N.Y.2004) (citations omitted). Thus, "[j]urisdiction may be found in [the District of Columbia] where a foreign parent maintains a subsidiary in a forum state and the subsidiary either 1) acts as an agent for the parent ... or 2) exists as an alter ego of the parent." *Id.* Under an alter ego theory, a court may disregard the corporate entity and impute the acts of the subsidiary to the parent if "the parent used the corporate entity to perpetuate a fraud or wrong on another." *Id.* Nevertheless, even a wholly owned subsidiary is presumed to be a separate entity in the absence of "clear evidence" that it is controlled by the parent. *Id.* Here, the plaintiffs' Amended Complaint does not allege that Newmont Peru has had any contacts with the District of Columbia. *See generally* Am. Compl. As such, the plaintiffs cannot demonstrate that Newmont USA "maintains a subsidiary in a forum state and the subsidiary either 1) acts as an agent for the parent ... or 2) exists as an alter ego of the parent." *In re Ski Train Fire in Kaprun, Austria*, 2004 WL 2260594, at *4. The only theory posited by

the plaintiff as grounds for this Court to exercise general or specific jurisdiction over Newmont Peru is that as a 100% owned subsidiary of Newmont USA, Newmont Peru is the alter ego of Newmont USA. Am. Compl. ¶ 6. Because the Court has already ruled that Newmont USA is not subject to personal jurisdiction in the District, Newmont Peru's alleged status as its alter ego is irrelevant in the jurisdictional analysis. In any event, the plaintiffs have offered no evidence to support their claim that Newmont Peru is the alter ego of Newmont USA. Rather, they have only presented the conclusory statement that "upon information and belief, Newmont Peru is simply a shell that acts for Newmont USA. Newmont Peru has no physical assets separate and apart from Newmont USA, except a desk and chair located in Lima, Peru." Am. Compl. ¶ 6. Therefore, this Court concludes that it cannot exercise personal jurisdiction over Newmont Peru pursuant to the alter ego theory of jurisdiction.

### b. Minera Yanacocha as the Alter Ego of Newmont USA

To support its position that Minera Yanacocha is the alter ego of Newmont USA, the plaintiffs allege: (1) as a leasehold owned by Newmont USA, all activities at the Yanacocha mines are controlled by Newmont USA; (2) 150 Newmont USA employees control the daily engineering and management activities of Minera Yanacocha; (3) Minera Yanacocha has no other significant function but to extract gold from the Peruvian Andes on behalf of

the joint venture, of which Newmont USA is the majority owner; (4) Newmont USA has consolidated financial yields of the Yanacocha Mining Company within its own financial statements; and (5) Michael Mitchell, an American citizen who relocated to Peru, serves as the mines *de facto* General Manager even though Dr. Carlos Enrique Santa Cruz is officially identified as the Vice President and Managing Director of Minera Yanacocha.[33] Am. Compl. ¶¶ 8, 10.

On the other hand, Minera Yanacocha also denies that it is the alter ego of Newmont USA. Newmont's Reply at 4. First, it contends that Newmont USA is not subject to personal jurisdiction in the District thereby precluding an extension of the Court's jurisdiction over Newmont USA under the alter ego theory. *Id.* Second, Minera Yanacocha maintains that the plaintiffs have failed to produce affirmative evidence which shows that Minera Yanacocha is not a separate entity from Newmont USA to support their "bald assertions" to the contrary. *Id.*

The Court agrees with the Newmont defendants and therefore concludes that the plaintiffs have failed to satisfy their burden of showing that Minera Yanacocha is the alter ego of Newmont USA. As noted by Minera Yanacocha, because Newmont USA is not subject to personal jurisdiction in the District, Minera Yanacocha is likewise not subject to jurisdiction in the District under the alter ego theory. *Material Supply*, 62 F.Supp.2d at 20; *Diamond*

---

**33.** This last assertion is directly contradicted by Dr. Santa Cruz's representations that he holds these titles with Newmont Peru and Frederico Schwalb Helguero has served as General Manager of Minera Yanacocha since January 2002. Newmont's Mem., Ex. A (Declaration of Federico Schwalb Helguero in Support of Motion to Dismiss by Minera Yanacocha and the Newmont Defendants dated

February 24, 2003) ¶ 1; Ex. B (Declaration of Carlos Santa Cruz in Support of Motion to Dismiss by Minera Yanacocha and the Newmont Defendants dated February 24, 2003) ¶ 1. And plaintiff's assertion that Newmont USA controls the daily operations at the Yanacocha mines is contradicted by an IFC report which states that Newmont Peru manages the Yanacocha mines. Pls.' Opp., Ex. 5.

*Chem.,* 268 F.Supp.2d at 1 (court declined to assign alter ego status to a subsidiary which shared executives, trademarks and a common marketing strategy of the parent corporation). Despite Newmont USA's financial stake in the success of Minera Yanacocha, the evidence, or the absence of evidence, compels the conclusion that Minera Yanacocha is a distinct entity with interests separate from Newmont USA. *See* Pls.' Opp., Ex. 4. The *Diamond Chem.* Court explained:

> A "subsidiary corporation" is one which is controlled by another corporation by reason of the latter's ownership of at least a majority of the shares of the capital stock. Notwithstanding the fact that two corporations may be extremely interrelated, each is deemed to have an independent existence. The mere ownership of the capital stock of one corporation by another does not create an identity of corporate interest between the two companies, or create the relationship of principal and agent, or representative, or alter ego between the two. A corporation, just as an individual, is entitled to the benefits of limited liability if it chooses to invest in the securities of other corporations and may exercise the control which inheres in stock ownership. A parent corporation does not lose the benefits of limited liability by taking an active interest in the affairs of its subsidiary, by using its voting power to elect directors, or by entering into contracts with the subsidiary, so long as the corporate formalities are observed.

268 F.Supp. at 18. Most telling in this case is the contract which underlies the dispute between the parties, that was executed by AGS and Minera Yanacocha, to which Newmont USA was not a party.

Am. Compl. Ex. A. Moreover, as noted already, the funding provided by the IFC was directly made to Minera Yanacocha. Pls.' Opp., Ex. 5. Finally, Newmont Peru, and not Newmont USA, manages the Yanacocha mines, which is staffed by Peruvian nationals. Pls.' Opp., Ex. 4. Accordingly, the plaintiffs have failed to satisfy their burden of showing that Minera Yanacocha is the alter ego of Newmont USA.

### III. *Conclusion*

For all of the reasons set forth above, this Court concludes that the plaintiffs' claims against the defendants must be dismissed because it cannot exercise personal jurisdiction over any of the five defendants. Therefore, because this court concludes that it lacks personal jurisdiction over any of the defendants, the court will not consider the other challenges raised by the defendants, namely, whether the Court has subject matter jurisdiction over the RICO and Lanham Act claims, whether the plaintiffs have failed to state a claim upon which relief may be granted, and Sodexho's Motion to Dismiss for Forum Non Conveniens.[34]

---

**34.** An Order consistent with this Memorandum Opinion was issued on September 30, 2004.